which is MidAmerica v. Siemens, 20-11266. And we have Mr. McGinley for the appellant, Mr. Martin for the appellee. Mr. McGinley, once you're settled, feel free to fire away. Good morning, Your Honors. May it please the Court, Michael McGinley of Deckard LLP on behalf of the appellants. I'd like to reserve three minutes for rebuttal. Very well. The trial court in this case committed a series of reversible legal errors, all of which had the effect of invading the province of the jury and denying appellants their claim, their right to try their claims and defenses. Each warrants reversal in its own right. First, the district court improperly excluded SECURES expert, Mr. Kostrin, on the manifestly erroneous view that he had not adequately compared the failures of identical gasifiers in China and the gasifiers that SECURES purchased from Siemens. Dr. Kostrin, in fact, had compared what occurred in China and the plans that SECURES had with respect to its own gasifiers. And in doing so, he employed his professional experience and knowledge with respect to these sorts of projects. In order to confirm the link between the two gasifiers, he relied on much more than Ipsy-Dixit, which is what the district court said. Instead, he relied on the best evidence of all, which is Siemens' own admissions and the actions that Siemens took in response to the failures in China. Repeatedly in the record, Siemens states that mandatory changes were required for their gasifiers to be viable in other projects, including SECURES, and projects that were planned in Texas with respect to the same gasifiers. In fact, the record shows that Siemens' message to SECURES, which it never delivered, by the way, is that they would need to scrap their equipment and start all over because the same problems would plague SECURES' identical gasifiers. Those facts place this case squarely within this court's decision in Siemens, which dealt with an expert who was going to compare flaws in the design of two identical rifles, had not been able to test the plaintiff's rifle, and the defense had raised issues regarding alternative causes. The district court in that case had excluded the expert under Dalbert for essentially the same reasons that the trial judge excluded Mr. Kostern here. This court reversed, holding that the comparison method was reliable and could be sent to the jury, and explaining that issues regarding alternative causes are issues that go to weight, not reliability, and therefore should be raised on cross-examination.  And then also in the Jaguar case, which I think is known as Hessen, the court stated that it's permissible for an expert to look at flaws that are admitted by the defendant. In that case, it was a series of models of Jaguars that were in fact different from the model that the plaintiff had purchased, where Jaguar had issued recalls with regard to the fuel injection system or something that had caused a fire in the car. And the court said it was permissible for an expert in that case to compare the two products, even though they were not identical, and to say that the same problems would plague the plaintiff's product. So can I ask you a quick question, if I'm understanding the other side's argument correctly? They say, in addition to the fact that this does seem like a pretty hands-off analysis by your expert, you know, sort of no testing of the equipment in issue, no user testing of the equipment in China, but as to comparison, they say there are some different variables here, different inputs. There's coal, coal type, load, things like that that he didn't adequately account for. Yeah. So that's their argument. I would say two things, Your Honor. One, that's actually not true. The most important reason it's not true is that the coal type and the coal load were things that Siemens never actually said were the problems with the gasifiers. If it were the case that the coal type could solve all the problems in China, then Siemens quickly could have told the Chinese, hey, don't worry, just change your coal type and it'll be fine, or they could have told the Texas Clean Energy Project, hey, don't worry, you use different coal, everything will be fine, no changes are necessary. Instead, what happened in China is 88 modifications were necessary, including a complete replacement of the burners before the products ever worked as they were expected. And with regard to Texas Clean Energy, which was a project that Siemens was trying to bid for at the same time it was concealing the information from Secure, Siemens said there were 26 mandatory changes, not that, you know, oh, don't worry, your coal quality is better, everything will work, 26 mandatory changes to make it viable. And those changes, including a complete redesign of the burner and an expansion of the reactor chamber, clearly Secure could not expand its 220-ton equipment while it was already on site. So the other thing I would say, Your Honor, is that, you know, as I mentioned in the cases that I cited, which are Rosenfeld, Siemens, Adams, Quiet Technology, this court has made crystal clear that when the defense comes, it said, oh, you didn't consider this alternative cause, that's an issue for cross-examination. It's not a reason to knock out the expert entirely under Daubert. Doing so extends beyond the court's gatekeeping function and essentially invades the province of the jury and the plaintiff's ability to present their case. The other thing I would say, Your Honor, is that we certainly think that Dr. Kostrin's analysis should have been let in, would have been helpful to her jury, and should have been upheld under Daubert. But even if he was excluded, it was clear legal error for the district court to say that summary judgment had to be entered on our fraud, rescission, and breach of warranty claims merely because we didn't have an expert. There's no law from this circuit that says that. The only case the other side cites is a case called Gwynn, which in that case is clearly distinguishable because the plaintiff in Gwynn admitted that she had no evidence other than her expert. Here we have extensive record evidence with regard to not only the design defects, but most importantly the concealment of them and the effort to take millions of dollars from Secure, ranging from the $40 million that Secure paid for the gasifiers through the $13 million that Siemens was seeking to bring in under the licensing and servicing agreement. And the internal emails say, I mean, honestly, shocking things, ranging from that the gasifiers are a Potemkin village, that everything should be scrapped, they should tell Mr. Kenny, the CEO of Secure, that over a barrel of whiskey, that they want to take every penny from Secure before they find out about the dust accumulation issues, and then a pretty blunt statement from Mr. Rusler that says, oh, don't worry, we'll get all the money in-house before they're even able to find out about the dust accumulation. A lay jury doesn't need an expert to be told that that's fraud. I mean, that seems like basic fraud where there's an inducement to purchase equipment, an inducement to enter into future contracts, and the defendant knows that its inducements were false. It fails to disclose material facts that would change the plaintiff's decision to enter into those contracts. And the other thing I'd point out, it's not just those internal email statements, but the other clear fraudulent inducement was that Siemens told Secure that NCPP, which is a Chinese facility, passed its performance guarantees in 2011, and that was before the new 2012 LSA contract. That was false. They didn't pass the performance guarantees until 2013, at which point the Chinese had actually replaced the Siemens burner with a completely different burner from a company called 7-Eleven. But obviously you hired an expert witness because you recognized that there were some pretty complex scientific matters at work underlying the breach of contract and the fraud claims. And while our court hasn't said that in every breach of contract claim or fraud claim, you're going to have to have an expert witness, underlying all of this is, as I said, pretty complex scientific facts at work in comparing these two pieces of equipment. How do you get around our case law that says when you do have such complex matters, these matters are outside the scope of a layperson's knowledge, so an expert testimony is required? I think it's pretty simple, Your Honor, and it really flows from the Sixth Circuit's decision in Meridia, which says that when there's admissions of the defendant with regard to defect and causation, you don't need an expert. Now, did they admit... Are you saying that they admitted defect or that they admitted fraud, in effect? I would say that... I mean, look, I would say they admitted defect, and I would say their statements themselves on their face show fraud. And so the reason they admitted defect is that they knew that in China, the only way for the equipment to work was the 88 modifications that occurred, only three of which came from Siemens, I should point out, and one of which was a complete replacement of their burners. So, you know, in that plant, Siemens burners never worked. They never functioned as they were supposed to. So they knew that. They never told Secure that. Instead, they told them that, oh, don't worry, everything passed in China, and we should enter into this new 2012 LSA. And then when they went to Texas Clean Energy, which was being backed by a Chinese company who knew about what happened in Xinhua, they said, oh, don't worry, there's 26 mandatory improvements that we're implementing. Everything will work. One of those improvements was expansion of the gasifier itself, which obviously couldn't be done after the fact at Secure's facility. So I think those are the admissions. I mean, they call it a Potemkin village, right? I mean, that seems like an admission. They admit that everything should be scrapped and Secure should start over. That's an admission. And then with regard to the fraud, I think the statements on their face are pretty clear. A lay juror could understand them if they were presented with the evidence. And the reason we had an expert to go to Judge Branch's question is that, yes, I think an expert would be helpful here. I think it would assist the trier effect. There's a difference between necessary and helpful. And the other piece of Dr. Kostrin's analysis was not just the defects, but also he was a bankers engineer, which meant that he worked on projects like this to help banks and EPC contractors and others understand how the equipment would fit together and help secure the $2 billion in financing that's required to get a project like this off the ground. And so he was able to talk about what would happen if an investment bank or an EPC contractor found out the equipment that is the engine of the entire project, literally the heart of that project, failed miserably the only other time it's been fired up. And so, you know, even setting aside the design defect piece, we think it was clear and manifest error for the district court to exclude him on that basis. The other thing, just because I see my time is starting to get low, I just want to make sure that I mention that we also think that it was manifest error for the trial court to deny leave to amend. We understand that this is a case where it's a mixed Rule 16 and Rule 15 analysis because the court had set in the scheduling order a deadline to amend. The only reasons that the trial court gave for denying leave to amend is they said that Secure hadn't been diligent in pursuing the evidence that made up the basis of the amendment request. That's just patently false, frankly. Secure had issued document requests well before the deadline to amend. Siemens delayed document production for over a year. Secure then very quickly asked for depositions of key witnesses. Again, Siemens delayed for over a year. Once it came out in Mr. Hanneman's deposition and Mr. Reussler's depositions that Siemens actually had nothing close to the experience and the testing on the equipment that they claimed they did at the beginning of the party's relationship, Secure very quickly moved to amend, honestly, right after Christmas. So they really delayed no time whatsoever in between. So it's just a false premise, which we think is reversible error. And then the last thing I'll say with regard to amendment is that we think if the court were to rule on the amendment issue, which we understand is abuse of discretion, but we think it's pretty clear here, our view is that unwinds everything back. You probably... We would like you to rule on all three of the issues so that the similar errors don't occur on remand, but most likely if we're allowed to amend, we then have new expert disclosures and some limited expert discovery and new summary judgment, obviously. With that, I'll reserve the remainder for rebuttal. Thank you, Your Honors. Very well. Mr. Martin? Good morning, Your Honors. May it please the court, James Martin for Appellee Siemens. The opening argument here was built around an amendment to the complaint that Secure never obtained. This is not a fraudulent inducement case. The reason that Secure had an expert witness was the first amended complaint, as pled, was built on alleged concealment of defects. The paragraphs in the complaint that provided for that were identified by the district court in its Daubert order, and the effort to wind this case back to fraudulent concealment, what was twice rejected, I should say three times rejected, by the district court in exercise of discretion in connection with the motions for leave to amend. So let me start there. Because this whole rewind for all these documents and all this purported fraud doesn't relate to Dr. Kostran's testimony. He didn't rely on it. And it doesn't... He didn't rely on it for his defect opinions. And it's a do-over. The denial of these amendments was based on their timeliness. They were untimely. 18 months after the close of amended pleadings in one case, two years in the other. It was based on the record that was not made. The motions were made under Rule 15. Rule 16 was the controlling standard. No good cause was shown, and the district court explained why. And finally, in two places, or two pieces of this, the factual support for it was apparent. Secure motions were going to severely prejudice Siemens in changing fundamentally the nature of this case at the close of discovery and when Siemens couldn't do anything about it. Is it any wonder that the district court said no? Now, there's some disagreement with that, but manifestly disagreement does not show an abuse of discretion. Where you have an unfounded motion made in an untimely manner under the wrong rule, that's a proper exercise of discretion. And let me unpack this just once more quickly. The point of all this is that it was going to fundamentally change the case. What had been a defect case up to that point was now going to be this fraudulent deducement case going back to 2007. In the face of a record where Secure had admitted that its claims had to start after October 2010, not when the contract was entered into, because of its concession in an express agreement that it had waived everything before that and released Siemens from that and that Siemens had fully performed. So that's why the district court said no. And again, there can be some disagreement with that. Finally, backfilling with this deposition testimony that we heard about, take a look at the motions. The deposition testimony is referred to, but it's never attached, it's never analyzed, it's never pointed out why it's a reason for the delay in amending. And without that, of course, there's no showing of good cause. All we have is a delay. Documents that are the basis of the amended complaints were in Secure's possession in 2017, a year before these motions were made, and no explanation was ever given for why the amendments weren't made sooner. That's a proper exercise of discretion. Now, turning back to Costren, his testimony was essential because this case was about defects. The district court recognized that and that's why he held the Daubert hearing right out the gate. He knew that this is where the case was going to swing and he spent a lot of time with Dr. Costren in that hearing, exploring the basis for his opinion that what was experienced and looked at in these documents at the NCP plant would actually show that there would be material design defects in Secure's project whenever it undertook to do it. Now, we know, of course, that the reason that the project never came to be had nothing to do with the defects because Secure never had the financial wherewithal to perform, but looking at the defects themselves, it was absolutely critical to make a point-by-point comparison between what was going on in NCPP and what was going on or would have gone on at Secure to compare the specifications, to compare the equipment, and figure out if there were material design defects in the NCPP equipment that would have translated to what Secure wanted to do. This was something that Dr. Costren admitted he never did and he admitted it throughout his deposition that he did not make that defect comparison. In fact, he also admitted that he never looked at any design defects in the NCP plant to compare them to whether they would be design defects in the Secure plant. He said, I didn't do it. So the district court, understandably, unpacked all of that in its order. And by the way, this emphasis on the coal, it was important. Everybody agreed, all the experts and Dr. Costren, that the out-of-spec coal that was being used at NCPP, which was a breach of its warranty with Siemens, affected how the equipment worked. And he didn't look at it. He didn't do any simulations. He didn't do any modeling. He didn't talk to the engineers involved. He didn't know what the projects were about. And this isn't a toaster, Your Honor, where we flip a switch and down it goes. These are gasification plants. They are enormous installations, and this gasification equipment is just one part of it. But it matters what the specifications are. It matters how the equipment is used, and you can't begin to make that a comparison until you study it. And that's what Secure does not have expert testimony on. What about my question, though? Even assuming there is no testimony from Dr. Costren that the district court did not err in excluding that, your opposing counsel has pointed out there's some pretty devastating e-mails that Siemens has produced, not the least of which is the October 2012 e-mail saying don't use the NCPP in our marketing materials because this is a Potemkin village. I mean, that is an inflammatory term. We all know what that means. That's a big deal. And there are other things that indicate that there were massive problems going on at the other plant that it would involve a total redo, total scrapping of that equipment in that plant and starting over from scratch over here with MidAmerica. Why isn't there enough in the record to go forward with the claims as currently planned? So, Your Honor, the first reason is that the interpretation of all those documents, including scrap value and Potemkin village, is vastly overstated in the briefing. If you unpack what is in those documents, you'll see a couple things. Let me start with scrap value, okay? The scrap value issue came up in the Daubert hearing, and you'll see at the end of the Daubert ruling that the court looks at it and says there's no smoking gun. So what are these two scrap value opinions? The first one came up five years after the sale of the equipment in 2007. That's the first e-mail. And the reason that scrap value made its way into that e-mail string was that Secure was fundamentally changing its project. And as the court knows, that happened two or three times in this fact pattern. The fundamental changes that Secure was proposing made material differences to equipment that was used and sold in 2007, five years before this e-mail happened. And if you read the e-mail, Seaman's witness is saying, if that's what they're going to do, we're going to have to scrap what we have, and we're going to have to look at the engineering package and everything else again. That is not any kind of a statement about design defects in the equipment that will prevent Secure's project from getting off the ground. I might also add that Secure didn't have the ability to perform when that scrap value opinion was given. But let's go to the next e-mail. It's about a control unit, a piece of software control, seven years after the equipment was... No, no, I'll do Potemkin in a second. Seven years after the equipment was sold, and the control unit was outdated. Well, of course it was. It was a small piece of software that had to be scrapped because it was outdated. This is why the district court said, there is no smoking gun there. These documents in isolation don't reveal any kind of defect that is necessary for Secure to carry its burden of proof. The Potemkin Village was a Siemens witness telling other Siemens people, don't use that picture of one of the units in our advertising. It shows the unit as being perfectly clean, and in operation, these units aren't clean. We're not going to use it. If we did, it would be a Potemkin Village. Now, first of all, that's not an admission of any kind of defect in anything. It's not an admission of any kind of defect in Siemens equipment, and it most certainly is not an admission of any kind of defect in Siemens equipment that would prevent Secure from undertaking its project. And this, in the end, Your Honor, is the fundamental problem with this document dump that the court has. Now, we unpacked a good bit of this in our brief, but if you look at these documents that seemingly show this independent, fraudulent concealment of design defects in the equipment, none of it is substantiated in the documents themselves as it relates to Secure's plant. There's a lot of back and forth between NCPP and Siemens about what's going on at NCPP's plant, and they had some fights about the burners and other things and the way they performed. And I might add, Siemens didn't pay a nickel to NCPP for any of their supposed complaints. They all got resolved. They all got fixed. The plant worked fine. Performance guarantees were signed off on, and NCPP bought 50 more gasifiers from Siemens. This was not a project that was defective. It was the back and forth in one of these massive plants when they're put online. Like my toaster, you don't just flip a switch and down goes the toast. These things operate in multiple units with careful specifications, loads, variables, and other things, and you have to get into that. Now, when you do, it doesn't always work just right. But the important thing about the documents is that they don't show defects between what's going on in China and what would have happened had Secure ever tried one of these hypothetical projects. That's where you still need the expert. You can't get from those documents to the defect proof that Secure needs without an expert witness. Somebody has to come in and say, hey, I looked at all this stuff that's talking about the NCP plant, and this matters for what Secure is intending to do. Some expert had to come in and say, you know what, here's the specifications for Secure's project. Here's the coal they're going to use. Here's the load they're going to use. Here's the variables that go into it. Here's the conversion that they're going to use. And none of the proposed conversions were like the one at NCPP, which was coal to polypropylene. Somebody has to say that. Nobody ever did. And Dr. Kostrin certainly did not. He admitted that his opinion was not based on these independent documents that supposedly show this massive defect. When you get to the bottom of this, what we have is not a judge who misunderstood this case and didn't get it, but who absolutely understood this case and reflected that in multiple orders. And at the end of the day, Dr. Kostrin's problems were not a subject for cross-examination. They were fundamental gaps in his reasoning process. And this court has consistently said that when an examination reveals those kinds of gaps, the court must exercise its gatekeeping function and not leave it for cross-examination. So the court did exactly the right thing, as this court has directed, as it did in its remaining discretionary rulings. And for that reason, the court should affirm. Very well. Thank you, Mr. Martin. Mr. McGinley, you've got three minutes remaining. Thank you, Your Honors. I'd like to start by going to the line of questioning from Judge Branch, which I think is spot-on, and it's not only the Potemkin Village e-mail, but there's this string of e-mails that can be found at Docket Entry 15815 where Rolf Reussler admits that Siemens is obligated under the LSA Section 5.1 to provide notice of improvements, but says that it'd be extremely costly to do so, would require lots of man-hours, and they'd rather spend the money on more lucrative projects. And then he says something that I honestly find quite shocking. He says, but don't worry, we'll completely get the millions of dollars in licensing fees in-house before, quote, dust-accumulation issues will ever arise. If that's not evidence of fraud, I don't know what is. And in fact, the response from his colleague is, essentially, I agree with you. We want to take every dollar SECURE can afford. So it's not, you know, we have design-defect problems. That's Potemkin Village. Scrap the equipment, start all over. But we also have the, you know, connection to fraud. This is in a context where they've not only sold the equipment, but also engaged in new contracts. The other thing I would say is that Siemens' response to all this is essentially to try to explain it away through various fact arguments. That's, of course, not amenable to summary judgment. They can make those arguments to a jury if they think that they're credible. A jury can decide whether or not those are credible. The other thing I would say is that Mr. Martin pointed out that NCPP bought additional gasifiers from Siemens. What he omits from that statement is the fact that those gasifiers were the new gasifiers with all of the mandatory changes that had been discovered through the first failure at NCPP and through the redesign. And, most importantly, what NCPP did is they said, we'll take the gasifiers, but your burners are so bad, we're going to replace them with the 7-Eleven. So nothing close to what SECURE had were those gasifiers that were later purchased. The other thing I would mention is that Siemens suggests that Dr. Kostern didn't make a defect comparison as between the two. That's not correct. Dr. Kostern looked at what happened at NCPP. He relied on the fact that Siemens' own witnesses, Mr. Schuld and Mr. Hanneman, said the gasifiers themselves were identical. They were from the same run of gasifiers. My recollection is NCPP got the first five, SECURE got the sixth and seventh. And this is the same as the Jaguar cases. In fact, it's even better, because in the Jaguar cases, they were different models. It's the same as the Remington rifle case, where you've got the same problems in the same product, and an expert is allowed to compare them and say that the plaintiff was likely to suffer the same... the plaintiff's equipment was likely to suffer the same problems. The last thing I'll say is that at the end of the day, Siemens' entire case on appeal is premised on the fact that a few of these issues are on abusive discretion. Abusive discretion clearly is not an inexorable standard of review, and we think that the errors here are manifest and obvious. Thank you, Your Honors. Thank you both very much. Well argued on both sides. That case is submitted, and we'll move to the...